# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

|  |  |
|---|---|
| NORTHERN ARAPAHO TRIBE, for itself and as *parens patriea*, <br><br> Plaintiff, <br><br> v. <br><br> DARRYL LaCOUNTE, LOUISE REYES, NORMA GOURNEAU, RAY NATION, MICHAEL BLACK, and other unknown individuals in their individual and official capacities. | CV-16-11-BLG-BMM <br> CV-16-60-BLG-BMM <br> (consolidated) <br><br><br><br> **ORDER on Plaintiff's Motion for Partial Summary Judgment and Defendants' Cross Motion for Summary Judgment** |

## Procedural Background

The Court conducted a hearing on Plaintiff NAT's Motion for Partial Summary Judgment (Doc. 130) and Federal Defendants' Cross Motion for Summary Judgment (Doc. 139) on March 20, 2017. NAT seeks partial summary judgment on its claims that the Federal Defendants wrongfully declined NAT's 638 contract proposal for judicial services and NAT's 638 contract proposal for youth and drug services. Federal Defendants argue in their Cross Motion for Summary Judgment that the BIA correctly declined NAT's 638 Contract Proposals

1

for judicial services, youth and drug services, fish and game, and tribal water engineers.

## Factual Background

The Shoshone Tribe and the United States entered into a Treaty on July 2, 1868. 15 State. 673. The treaty established the Wind River Reservation "for the absolute and undisturbed use and occupation of the Shoshonee Indians." 15 State. 673. The Eastern Shoshonee Tribe ("EST") settled in the Wind River Reservation. The United States soon reneged on its earlier treaty commitment to the EST when it placed NAT on the Wind River Reservation in 1878.

Each tribe governs itself by vote of its tribal membership at general council meetings or by vote of its elected business council. *N. Arapaho Tribe v. Hodel*, 808 F. 2d 741, 744 (10th Cir. 1987). No member of one tribe may hold office or legislate for the other tribe. The tribes have not entered into a joint constitution to consolidate their respective governments. (Doc. 17-8.) The tribes' joint occupation of the Wind River Reservation without a confederation agreement makes their situation unique in the nation.

EST and NAT do not operate under a "common sovereignty." *E. Shoshone Tribe v. N. Arapaho Tribe*, 926 F. Supp. 1024, 1031 (D. Wyo. 1996). As a result, the federal government created the Joint Business Council ("JBC") following the Indian Reorganization Act of 1934. The federal government apparently considered

it easier to interact with the two tribes' business councils in joint form. (Doc. 78-1.) The JBC originally contained the requirement that a quorum comprise four members from each tribe. (Doc. 1 at 11.) NAT formally withdrew its participation from the JBC in September 2014.

The Indian Self-Determination and Education Assistance Act ("ISDEAA") governs 638 self-determination contracts. 25 U.S.C. § 450. The contracts allow tribes and tribal organizations to enter agreements with the federal government. The federal government supplies funding under 638 self-determination contracts to the tribal organizations to assume the administration of programs that the federal government otherwise would have administered on behalf of the tribe. *Hinsley v. Standing Rock Child Protective Services*, 516 F. 3d 668, 670 (8th Cir. 2008); *Manuel v. U.S.*, 2014 WL 6389572, at *5 (E.D. Cal. Nov. 14, 2014).

The two tribes historically have contracted jointly with the BIA through the 638 contracting program to provide certain services to members of both tribes. These traditionally shared services include the policy areas addressed by the four 638 contract proposals at issue. NAT separately has proposed four 638 contracts for fiscal year 2017. These contracts would be implemented solely by NAT. These contracts purport to offer services solely to NAT members that formerly had been shared between the two tribes.

Section 5321(a)(1) of Title 25 of the U.S. Code authorizes the BIA to enter into a 638 contract with a "tribal organization." Section 5304(l) defines "tribal organization" and adds the following caveat:

> That in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, *the approval of each such Indian tribe* shall be a prerequisite to the letting or making of such contract or grant.

25 U.S.C. § 5304(l) (emphasis added). These last two provisions – a contract to perform services for the benefit of more than one tribe and the requirement for approval from all affected tribes – control much of the Court's analysis.

## Analysis

The Court grants summary judgment where a moving party demonstrates both that "no genuine dispute as to any material fact" exists and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts consider "material' only disputes over facts that might affect the outcome of the suit under the state substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-631 (9th Cir. 1987).

ISDEAA provides for a statutory exception to the normal arbitrary and capricious standard, and, as a result, the Court will review de novo the BIA's

declinations. *See Navajo Health Foundation-Sage Mem'l Hosp.*, 2016 WL

7257245, at 14. De novo review reflects judicial concern with the BIA's history of

recalcitrance in awarding contracts and the reflection of this history in ISDEAA's

provisions. *Shoshone-Bannock Tribes of Ft. Hall Reservation v. Shalala*, 988 F.

Supp. 1306, 1315-1316 (D. Or. 1997). ISDEAA specifically imposes on the BIA

"the burden of proof to establish by clearly demonstrating the validity of the

grounds for declining the contract proposal." 25 U.S.C. § 5321(e)(1).

### a. Judicial Services Proposals

The BIA instituted a Court of Indian Offenses ("CFR Court") on the Wind

River Reservation on October 18, 2016. The CFR Court replaced the Shoshone and

Arapaho Tribal Court. The two tribes jointly had operated the Shoshone and

Arapaho Tribal Court. The BIA announced that "it was proposing a protocol to

govern the allocation and transfer of cases" between the former tribal court and the

newly established CFR Court. (Doc 123 at 11.)

NAT proposed a separate judicial services contract to the BIA on January

22, 2016. Admin. Record ("AR") at 1-11. The judicial services contract sought to

obtain funding for a new, separate NAT Tribal Court. NAT proposed that the NAT

Tribal Court would provide "judicial services for [NAT] members . . . and such

others as may be within the jurisdiction of the Tribe as a matter of law." *Id.* NAT

specifically requested "at least 70 percent" of the funds normally allocated for shared judicial services for the two tribes. *Id.*

The BIA declined NAT's proposal on April 19, 2016, due to its determination that judicial services on the Wind River Reservation "cannot be properly completed or maintained by the proposed contract," as required by 25 C.F.R. Part 900.22(c). AR 19. The BIA explained that the Shoshone and Arapaho Law and Order Code had not been amended to reflect a separate and new judicial code as proposed by the NAT. *Id.*

The BIA sought to offer further explanation for its declination in a letter of May 5, 2016. AR 21. This second letter, sent after the 90-day response deadline, noted that NAT's proposal failed to explain how the proposed court would "interact with other courts operating within the same territorial jurisdiction, including the Shoshone and Arapaho Tribal Court or how it would interact with BIA law enforcement personnel operating on the Reservation." (Doc. 138.) The BIA further explained that it could not provide funding for the NAT court and still provide sufficient funding to a separate courts program for the EST. *Id.*

NAT submitted a supplement to its proposal on August 11, 2016, that sought to address some of the deficiencies noted by the BIA in its initial declination. AR 23. The BIA declined this supplement on November 7, 2016. AR 117-18. The BIA

first noted that the contract could not be granted "without undermining BIA ability to operate a CFR Court for the benefit of the [EST]." (Doc. 138 at 122.) The BIA further reasoned that no provision of the ISDEAA required it to reduce funding for the EST in order to make funds available to the NAT. *Id.*, citing 25 U.S.C. §5325(b). The BIA further cited this Court's Order that relied upon 25 U.S.C. § 5304(l), to enjoin the BIA "from approving 638 contracts for multi-tribal, shared services without the approval, via tribal government resolution, of both the [NAT] and the [EST]." (Doc. 138 at 123.)

NAT submitted a third and final proposal for judicial services on September 30, 2016. AR 36-111. The final proposal sought to obtain funding to operate a joint tribal court. The BIA agreed to award a 638 contract to fund a joint tribal court if NAT and EST would agree to and sign the same contract. AR 113-16. NAT and EST failed to reach an agreement. The BIA officially denied NAT's final proposal on December 23, 2016. AR 120-22. The BIA's reasons for the declination largely mirrored the previous declinations.

Section 5321(a)(1) of Title 25 of the U.S. Code authorizes the BIA to enter into a 638 contract with a "tribal organization." Section 5304(l) defines "tribal organization" and adds a provision that *"the approval of each such Indian tribe shall be a prerequisite"* where a contract or grant would be made to an organization to perform services benefiting more than one Indian tribe. 25 U.S.C. § 5304(l)

7

(emphasis added). The Court agreed in its previous Order that § 5304(l) barred the BIA barred from awarding 638 contracts for shared services to the Joint Business Council without both EST and NAT supporting resolutions. (Doc. 24.)

The plain language of NAT's judicial services proposal indicates that it seeks to provide a service "benefitting more than one tribe" under 25 U.S.C. § 5304(l). NAT's judicial services proposal stated that "the Northern Arapaho Tribal Court will exercise full criminal jurisdiction over crimes allegedly committed by members of the Tribe and such others as may be subject to the criminal jurisdiction of the Tribe." The proposal also stated that "the Court's territorial jurisdiction encompasses the exterior boundaries of the Wind River Reservation." The Supreme Court's determination in *United States v. Lara*, 541 U.S. 193, 199 (2004), confirmed that a tribe possesses criminal jurisdiction over non-member Indians. These factors indicate that EST would need to enact a supporting resolution in order for the BIA to approve the judicial services proposal. 25 U.S.C. § 5304(l).

NAT cites ISDEAA legislative history to support its claim that the relevant inquiry focuses on what group of people a tribe seeks to serve. (Doc. 146 at 28.) Specifically, NAT points to language from the Senate Report that "a tribal organization needs to obtain tribal resolutions only from the tribes it proposes to serve." S. Rep. 100-274 at 20 (1988). NAT contends that it seeks to provide

8

judicial services only to its members, and, as a result, need not obtain approval from EST for its judicial services proposal. NAT further asserts that the Supreme Court's holding in *Lara*, on its own, fails to prove that EST would benefit from the judicial services provided through the proposed contract. The Court disagrees.

The proposed NAT Tribal Court necessarily would operate to the benefit of EST members. An EST member would be allowed to bring a civil case in NAT Tribal Court that arose within the "exterior boundaries of the Wind River Reservation." More importantly, NAT also could prosecute an EST member in a criminal case. NAT argues that these benefits do not rise to the level of "benefitting" as contemplated by 25 U.S.C. § 5304(l). This claim fails to recognize the unique nature of NAT and EST being forced to share the Wind River Reservation without a confederation agreement. EST members will interact more regularly with the NAT Tribal Court than any other non-member Indians. Unlike other non-member Indians, EST members could be living on their own reservation, without having willingly submitted to the NAT Tribal Court's jurisdiction, yet nevertheless be subject to the proposed NAT court's jurisdiction.

The BIA also must ensure that services continue to be provided to tribes not served by a 638 proposal. 25 U.S.C. § 5324(i). NAT proposed that funds available for judicial services should be allocated 70 percent to NAT and 30 percent to EST, or 30 percent to the BIA to provide services for EST. Federal Defendants argue

that they could not staff the CFR Court with only 30 percent of the funds allocated for judicial services on Wind River Reservation, as the fixed costs of the CFR Court exceed the 30 percent funding allocation for EST proposed by NAT. AR 117; Gourneau Decl. ¶ 17.

By contrast, the BIA must accept a severable portion of a proposal over the funding allocation only if the BIA and the proposing tribe come to an agreement on an alteration in scope of the services offered by the contract. 25 U.S.C. § 5321(a)(4). NAT justifies the 70/30 split with the fact that the CFR Court employs only four fulltime employees. By comparison, the NAT Tribal Court employs 15 fulltime employees. (Doc. 146 at 24.) NAT also argues that the NAT Tribal Court currently has 120% of the civil cases pending before it than the shared Shoshone and Arapaho Tribal Court heard last year.

NAT uses these metrics to argue that the CFR Court does not need all $2,117,434.04 of the funds allocated for judicial services on the Wind River Reservation. *Id.* at 25. NAT further asserts that the BIA must negotiate in good faith with the NAT to find a funding solution. 25 U.S.C. § 5321(b)(2). NAT also argues that the clear and convincing evidentiary standard required the BIA to provide financials in its declination to further prove its inability to operate a CFR Court with 30 percent of the allocated funds. *Id.* at 26.

Section 5321(a)(2)(D) of ISDEAA allows the BIA to decline a tribe's proposal when "the amount of funds proposed under the contract" exceeds the applicable funding level for the contract. 25 U.S.C. § 5321(a)(2)(D). The Ninth Circuit interpreted § 5321(a)(2)(D) in *Los Coyotes Band of Cahuilla & Capeño Indians v. Jewell*, 729 F.3d 1025, 1035 (9th Cir. 2013), to mean that ISDEAA does not require the BIA to award contracts for services not currently being funded by the BIA.

NAT seeks to distinguish *Los Coyotes* based on the fact that the tribe in *Los Coyotes* proposed a contract for law enforcement services, but resided in a state, California, where state officials provided law enforcement. (Doc. 146 at 18-19.) NAT portrays the situation in *Los Coyotes* as a tribe asking for a type of service that the BIA has never provided for that tribe. NAT distinguishes these facts from the instant case where the BIA has provided funding for judicial services for the tribe in the past, albeit to both tribes in a single grant.

All of these factors support the potential feasibility of a separate NAT court rather than a requirement that the BIA authorize the 638 judicial services proposal at issue. None of these disputed factors prove "material" to the Court's analysis. *Liberty Lobby, Inc.*, 477 U.S. at 248. As the Court has explained, the proposed NAT court would benefit EST members, as contemplated by § 5304(l), by providing a forum for EST members to resolve civil claims, as the judicial services

11

proposal covers disputes that arise within the "exterior boundaries of the Wind River Reservation." The language of NAT's 638 judicial services proposal further indicates that the proposed NAT court would possess jurisdiction over EST members in criminal cases in which the alleged misconduct took place on the Wind River Reservation. The Supreme Court's decision in *Lara* confirms this point. This type of benefit to EST members would not be incidental, as the proposed NAT court would possess jurisdiction over any EST member who lives on the Wind River Reservation regardless of whether that EST member willingly submitted to the NAT court's jurisdiction.

The BIA justifiably cited § 5304(l) in its reasoning for declination of NAT's second and third judicial services proposal. AR 117-18; 120-122. Fed. R. Civ. P. 56(a) entitles the BIA to judgment as a matter of law on its declination of these two contracts in the absence of any disputed issues of material fact. The BIA failed to cite to § 5304(l), however, in its declination of NAT's first judicial services proposal or its supplement to that declination. AR 19, 21. The Court declines to comment on the BIA's stated reasons for declination of the first contract other than to deem them weaker and vaguer than a basis controlled by § 5304(l), and lack of contract approval from EST. The stated reasons for declination of the first judicial services contract prove insufficient on these grounds.

The Court deems it appropriate to remand this proposal back to the BIA for reconsideration. The Court adopts the rationale in *Southern Ute Indian Tribe v. Sebelius*, 657 F.3d 1071, 1083 (10th Cir. 2011), to support the remand. The Tenth Circuit in *Southern Ute Indian Tribe* distinguished *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007), on the basis that the BIA had "refused to continue funding an already-executed mature contract." *Southern Ute Indian Tribe*, 657 F.3d at 1083. The court's determination that the contract was "approved by operation of law" simply reflected the tribe's right to continued funding for costs incurred under an already existing contract. *Id.*, at 1083-1084.

We face a different scenario. The NAT seeks funding for a program formerly administered jointly by the NAT and EST. No costs have been incurred and no contract executed for the proposed program. Remand represents the usual administrative law remedy in the absence of special circumstances. *Citizens to Preserve Overton Park*, 401 U.S. at 420. The BIA timely must consider the proposal. In the event that the BIA declines the proposal, it must explain more accurately and fully any reasons for its declination.

### b. Fish and Game Proposal

NAT submitted a proposal for a 638 contract to fund a new Arapaho Fish and Game program on June 28, 2016. AR 123. NAT's proposal sought to obtain 100 percent of the funds allocated for wildlife resource management on the Wind

River Reservation. The BIA declined this proposal on September 19, 2016, in large part due to the fact that the proposal "will serve only members of the [NAT]." AR 145. The BIA explained that it would not accept proposals "to operate shared programs from one Tribe or tribal organization without agreement between the tribes on the operation of that program." *Id.*, citing 25 U.S.C. § 450b(1). The BIA further noted that 25 U.S.C. § 450f(a)(2)(d), authorizes it to reject NAT's proposal due to the fact that it requests 100 percent of the funding for wildlife resource management to serve only NAT members. *Id.*

Section 5325(b) requires the BIA to transfer funding to a 638 contracting tribe, but "at the same time to maintain . . . services to the non-contracting tribes." 25 U.S.C. § 5325(b); *see also Shoshone-Bannock Tribes of Ft. Hall Reservation v. Shalala*, 988 F. Supp. 1306, 1325 (D. Ore. 1997). Federal Defendants argue that the BIA could not continue to provide services to EST for management of wildlife resources if NAT received 100 percent of the funds previously allocated by the BIA for these services. Similarly, nothing in § 5321(a)(2)(A) requires the BIA to approve a severable portion of the previous funding if the 638 proposal requests funds "in excess of the applicable funding level." 25 U.S.C. § 5321(a)(2)(A). NAT's 638 proposal requests 100 percent of the funds previously allocated by the BIA for wildlife resource management. The BIA could not continue to provide

these services to EST, as required by § 5325(b), without spending "in excess" of current funding levels. 25 U.S.C. § 5321(a)(2)(A).

And finally, the Court addresses the hurdle imposed by § 5304(l). The 638 proposal at issue would appear to benefit both the NAT and the EST. NAT's proposal seeks 100 percent of the current funding level. The proposed 638 management contract would cover wildlife resources throughout the Wind River Reservation. The proposal attempts to make no distinction to cover only those wildlife resources located on NAT trust land to the exclusion of wildlife resources located on EST trust land. Section 5304(l) requires the approval of EST for a wildlife resources management contract under these circumstances. 25 U.S.C. § 5304(l).

NAT argues finally that the BIA failed to offer adequate technical assistance under 25 CFR § 900.30 for NAT to overcome barriers to contracting. (Doc. 146 at 17-18.) NAT acknowledges that the BIA offered "pro forma assistance" in the form of letters that acknowledged receipt of each proposal and offered technical assistance to NAT. *Id.* NAT claims, however, that it met silence from the BIA when it tried to follow up and ask for this assistance. Doc. 98-3; Doc. 127-3; AR 143-44.

Federal Defendants contend that the BIA made the required offer of technical assistance in its receipt acknowledgement letters. (Doc. 149 at 10.) Federal Defendants also argue that NAT's alleged requests for this assistance came 10 days before the BIA's declinations were due and that this request proved too late for the BIA to offer true technical assistance. *Id.* Technical assistance alone would have failed to overcome EST's failure to approve NAT's proposed wildlife resources management proposal in light of the requirement in § 5304(l). The scope of NAT's proposal to provide wildlife resources management within the exterior boundary of the Wind River Reservation mandated that EST approve the proposal. No amount of technical assistance could have overcome this missing prerequisite to BIA approval. 25 U.S.C. § 5304(l). Once again, Fed. R. Civ. P. 56(a) entitles the BIA to judgment as a matter of law on its declination of NAT's wildlife resources management contract in the absence of any disputed issues of material fact.

### c. Tribal Water Engineers Proposal

NAT submitted a proposal for a 638 contract to create an Arapaho Tribal Water Engineers program on June 28, 2016. AR 149. NAT's proposal sought "approximately" 70 percent of the funds allocated for shared water resource management on the Wind River Reservation. NAT based this funding allocation on the relative population of NAT tribal members compared to EST tribal members

on the Wind River Reservation. The BIA declined NAT's proposal on September 19, 2016. AR 172.

The BIA first noted that the proposal "will serve only members of the [NAT]," despite the undivided joint interest that the two tribes possess in the Wind River Reservation. AR 145. The BIA previously had explained that it would not accept proposals "to operate shared programs from one Tribe or tribal organization without agreement between the tribes on the operation of that program." *Id.*, citing 25 U.S.C. § 450b(1). The BIA further noted that 25 U.S.C. § 450f(a)(2)(d), authorizes it to reject NAT's proposal due to the fact that it requests 70 percent of the funding for water resource management to serve only NAT members. *Id.*

NAT contends that its Tribal Water Engineers proposal seeks only to "fund technicians to monitor water use." (Doc. 146 at 41.) NAT guarantees that it does not seek to regulate water use or alter the Shoshone and Arapaho Wind River Water Resources Control Board. This joint regulatory body primarily controls water resources on the reservation. NAT further argues that it does not seek to alter the joint tribal code governing water resources.

Section 5325(b) requires the BIA to transfer funding to a 638 contracting tribe, but "at the same time to maintain . . . services to the non-contracting tribes." 25 U.S.C. § 5325(b); *see also Shoshone-Bannock Tribes*, 988 F. Supp. at 1325.

Federal Defendants argue that the BIA could not continue to provide services to EST for water resource management if NAT received 70 percent of the funds previously allocated by the BIA for these services. Nothing in § 5321(a)(2)(A) requires the BIA to approve a severable portion of the previous funding if the 638 proposal requests funds "in excess of the applicable funding level." 25 U.S.C. § 5321(a)(2)(A). NAT's 638 proposal requests 70 percent of the funds previously allocated by the BIA for water resource management. The BIA could not continue to provide these services to EST, as required by § 5325(b), without spending "in excess" of current funding levels. 25 U.S.C. § 5321(a)(2)(A).

NAT argues that the BIA failed to offer adequate technical assistance under 25 CFR § 900.30 for NAT to overcome barriers to contracting. (Doc. 146 at 17-18.) NAT acknowledges that the BIA offered "pro forma assistance" in the form of letters that acknowledged receipt of each proposal and offered technical assistance to NAT. *Id.* NAT again claims that it met silence when it tried to seek technical assistance from the BIA. Doc. 98-3; Doc. 127-3; AR 143-44.

The BIA made the required offer of technical assistance in its declination letter. (Doc. 149 at 10.) Federal Defendants argue that NAT's alleged requests for this assistance came 10 days before the BIA's declinations were due and that this request was too late for the BIA to offer true technical assistance. *Id.* As discussed previously, however, technical assistance would have failed to overcome the

missing prerequisite of EST's approval of NAT's water resources management contract. 25 U.S.C. § 5304(l). Once again, Fed. R. Civ. P. 56(a) entitles the BIA to judgment as a matter of law on its declination of NAT's water resources management contract in the absence of any disputed issues of material fact.

### d. Youth and Drug Services Proposal

NAT submitted a proposal for a 638 contract to fund youth and drug services on June 28, 2016. AR 176. NAT's proposal sought 100 percent of the funding allocated for these services on the reservation. NAT and EST previously provided the proposed services to members of both tribes through the Meadowlark Youth Drug Court Program. Gourneau Decl. ¶ 10. NAT's proposal offered a new program that NAT solely would operate and that would offer services only to NAT members. The BIA declined NAT's youth and drug services proposal on September 19, 2016. AR 192.

The BIA explained that the proposal would serve only members of the NAT. *Id.* The BIA believed that a jointly operated program "of the Shoshone and Arapaho Tribes" previously had provided similar services to NAT members through the "Meadowlark" program. (Doc. 138 at 197.) The BIA would not accept proposals "to operate shared programs from one Tribe or tribal organization without agreement between the tribes on the operation of that program." *Id.*, citing 25 U.S.C. § 450b(1). The BIA finally noted that 25 U.S.C. § 450f(a)(2)(d)

authorizes it to reject NAT's proposal due to the fact that it requests 100 percent of the funding for a youth drug court to serve only NAT members. *Id.*

NAT asserts that the BIA failed to demonstrate that NAT's proposed funding for Youth Drug Court would result in decreased funding for EST. *Id.* NAT argues that funding based on relative population results in the same level of services and should result in a fair apportionment. NAT further challenges as a post-hoc justification the Federal Defendants' claims that a discretionary ISDEAA program previously had funded the Youth Drug Court.

The discretionary program "authorize[s]," but does not "direct" the BIA to "contract with or make a grant to any tribal organization" for "the improvement of tribally funded programs or activities." 25 U.S.C. § 5322(a)(1). The ISDEAA exempts discretionary contracts under this provision from the 90-day declination deadline for the five exceptions contained in 25 U.S.C. § 5321(a)(2)(A)-(E). Federal Defendants claim that the JBC originally acquired funding for the Meadowlark Program through the discretionary program and that NAT's proposal to continue these services in a different form still must be analyzed under the discretionary program. (Doc. 140 at 34.)

NAT claims that Federal Defendants did not acknowledge or advance this argument before its Cross Motion for Summary Judgment and that it represents an

improper post hoc justification. The Court agrees. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 401, 419 (1971). The Court deems it appropriate to remand this proposal back to the BIA for reconsideration, with all the attendant requirements of remand that the Court included in the above section regarding the first judicial services contract.

## Conclusion

The Court affirms the BIA's declinations of NAT's second and third judicial services proposals, wildlife resources management proposal, and water resources management proposal. The Court reverses the BIA's declination of NAT's youth court proposal, to the extent that the declination improperly relied upon post-hoc justifications, and NAT's first judicial services proposal. We remand these proposals to the BIA for reconsideration.

Accordingly, **IT IS ORDERED:**

1. NAT's Motion for Partial Summary Judgment (Doc. 130), is **GRANTED** to the limited extent that the BIA's declination of the First Judicial Services Contract and the Youth Drug Services Contract is reversed, and these contracts are remanded to the BIA for re-consideration. NAT's Motion for Partial Summary Judgment (Doc. 130), is otherwise **DENIED**.

2. Federal Defendants' Cross Motion for Summary Judgment (Doc. 139), is **GRANTED** to the extent that the BIA's declinations of the following contracts are affirmed: NAT's Second and Third Contract for Judicial Services, NAT's Fish and Game Contract, and NAT's Tribal Water Engineers Contract. Federal Defendants' Cross Motion for Summary Judgment (Doc. 139), is otherwise **DENIED.**

3. The Clerk is directed to enter judgment in this matter.

Dated this 22nd day of June, 2017.

Brian Morris
United States District Court Judge